UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| SHELTON BROCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:09-CV-00344 |
| | ) | |
| UNITED STATES STEEL CORPORATION, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Now before the Court is Defendant United States Steel Corporation's motion for summary judgment [DE 22]. For the reasons set forth below, Defendant's motion is GRANTED.

**I. Procedural History**

On September 10, 2009, Shelton L. Brock, an African American, brought suit against his employer, United States Steel Corporation ("U.S. Steel"), in the Porter Superior Court, alleging that U.S. Steel violated Title VII of the Civil Rights Act of 1964 by discharging him on two occasions based on his race. [DE 1]. Brock also brought claims of defamation and of intentional infliction of emotional distress under state law. *Id.* U.S. Steel removed the case to federal court on October 16, 2009, pursuant to 28 U.S.C. § 1331, on the ground that Brock's Title VII claim arises under the laws of the United States. [DE 2]. On November 3, 2009, U.S. Steel filed its answer to Brock's complaint [DE 9] along with a motion to dismiss Plaintiff's state law claims [DE 7] and a brief in support [DE 8]. The motion to dismiss was denied on January 27, 2010. [DE 11]. U.S. Steel subsequently filed an amended answer on February 2, 2010. [DE 12]. On October 28, 2010, U.S. Steel moved for summary judgment on all of Brock's claims. [DE 22].

Brock filed no response to the motion for summary judgment, despite his counsel's two requests for an extension of the response deadline, both of which were granted. [DE 27; DE 29].

## II. Factual History

The Court, having considered the motion for summary judgment filed by U.S. Steel, together with the pleadings, affidavits, and exhibits on file, and the fact that Plaintiff filed no response, finds the following facts to be uncontested:

### A. U.S. Steel's Employment Agreement and Policies

U.S. Steel operates a steel manufacturing facility in Gary, Indiana. [DE 23-1 at ¶ 2]. The employees that work at this facility are exposed to a wide range of safety risks that have the potential to cause injury. *Id.* at ¶ 6. In order to protect these employees, a Basic Labor Agreement ("BLA"), which contains terms of employment for U.S. Steel's production and maintenance employees, was agreed upon between U.S. Steel and the United Steelworkers of America ("USW"). *Id.* at ¶ 4. The BLA contains provisions that grant U.S. Steel the exclusive right to manage the business and direct the working forces, the ability to discipline and discharge employees, the right to set the hours of work, and provisions for various safety and health concerns, including preventing alcohol and drug abuse. *Id.* at ¶ 5; [DE 23-2; DE 23-3]. The BLA also contains a provision that prohibits discrimination against employees on the basis of their race, color, religious creed, national origin, citizenship, handicap, or sex. [DE 23-2 at 13-14].

In light of the fact that the potential for accidents and injury increases when U.S. Steel employees are impaired by drugs or alcohol during work hours, U.S. Steel has established a policy to keep its workplace free from drugs and alcohol. [DE 23-1 at ¶ 7, DE 23-4 at 3-5]. As part of this policy, and as a condition of employment, U.S. Steel requires all prospective employees to have a pre-placement physical, which includes submitting urine and hair samples

to the medical staff at U.S. Steel, in accordance with U.S. Steel's drug and alcohol testing procedures. [DE 23-1 at ¶ 9]. These procedures were created by Psychemedics Corporation, and include the collection of hair samples for drug testing. *Id.* at ¶ 10; [DE 23-4 at 7-23; DE 23-6 at ¶ 5]. According to U.S. Steel, testing hair is superior to testing bodily fluids for drug use because drug markers are present in hair significantly longer than in urine. [DE 23-6 at ¶ 5].

Newly hired production and maintenance employees at U.S. Steel are required to serve a probationary period for the first 1,040 hours of actual work and they receive no continuous service credit during this period. [DE 23-1 at ¶ 13; DE 23-7 at 9-10]. The probationary period allows U.S. Steel to determine whether a new employee can both perform the necessary work in a satisfactory manner and comply with U.S. Steel rules, policies, and procedures. [DE 23-1 at ¶ 14]. The BSA requires employees to submit to periodic drug and alcohol testing during their probationary period. *Id.* at ¶ 12. Probationary employees may be discharged by U.S. Steel, provided that their discharge does not violate provisions in the BLA. *Id.* at ¶ 15. In such cases, probationary employees have access to a grievance and arbitration procedure set forth in the BLA. *Id.*

**B. Brock's Employment with U.S. Steel**

Brock's employment with U.S. Steel began on September 10, 2007; however, prior to employment, Brock was required to pass a pre-placement physical. [DE 23-1 at ¶¶ 18, 20]. On August 17, 2007, Brock completed his pre-placement physical. *Id.* at ¶ 19; [DE 23-7 at 6]. At his physical, a hair sample was taken from Brock's underarms due to a lack of hair on his head. [DE 23-6 at ¶ 8; DE 23-7 at 7]. Brock was instructed to let his hair grow to at least one and a half inches in length for future testing. [DE 23-6 at ¶ 9]. On two subsequent occasions during his probationary period, Brock was tested for drugs. On each occasion, underarm hair had to be collected because he had no hair on his head. *Id.* at ¶ 11; [DE 23-7 at 17-18]. The notes from

3

Brock's fourth drug test state that no hair could be collected because Brock had no head, underarm, leg, or pubic hair. [DE 23-6 at ¶ 12; DE 23-9 at 5]. On the first day of his employment, Brock received a copy of the BLA, as well as other U.S. Steel policies. [DE 23-7 at 6, 9, 12-13]. These materials included provisions on U.S. Steel's policies prohibiting discrimination and policies designed to promote a drug-free workplace. *See* [DE 23-2; DE 23-3].

Brock was hired as a Utility Person (Labor Grade 1). He worked in the Iron Producing Division, and was represented by USW officers William Gray and Scott Craner. [DE 23-1 at ¶¶ 20, 21; DE 23-7 at 9, 13-14, 19, 23]. Brock's immediate supervisor was Process Coordinator David Hardy. [DE 23-1 at ¶ 26; DE 23-7 at 14]. Don Ramsey was another Process Coordinator in the area Brock worked, where Kevin Lemp was the Area Manager of Blast Furnace Operations. [DE 23-1 at ¶ 26]. Brock was assigned to work on the #4 and #6 blast furnaces at U.S. Steel's Gary Works, where he controlled the flow of molten iron from the blast furnace to the ladle cars, along with other general labor functions. [DE 23-1 at ¶ 21; DE 23-7 at 14-15]. These blast furnaces are considered high gas hazard areas. [DE 23-1 at ¶ 21].

Employees working in high gas hazard areas are required to wear carbon monoxide gas monitors, commonly referred to as "CO" monitors, as part of their personal protective equipment. [DE 23-1 at ¶ 22]. All employees working in high gas hazard areas are also required to conduct daily inspections and calibrate, commonly referred to as a "bump" test, their monitors prior to entering a hazard area. *Id.* at ¶ 23; [DE 23-5 at 3-7]. This procedure ensures that the equipment responds to gas properly before the employee enters the hazard area. [DE 23-1 at ¶ 24].

**C. Brock's First Termination**

On February 21, 2008, employees working on the #6 blast furnace dumped the dust-

4

catcher, which creates the possibility of dust and CO gas on the casthouse floor. [DE 23-1 at ¶ 27]. At this time, Brock was working at the base of the #6 blast furnace. When the dust-catcher was dumped, he was engulfed by steam and hazardous dust. [DE 23-7 at 18]. When paramedics arrived to treat Brock, his supervisor, David Hardy, removed Brock's CO monitor before Brock was taken to the infirmary for evaluation. *Id.*

During the investigation of the incident on February 21, 2008, Don Ramsey and Kevin Lemp determined that Brock had failed to calibrate his personal CO monitor before entering the hazard area. [DE 23-1 at ¶ 30]. The combination of this failure and Brock's presence in an area with high levels of CO gas resulted in his violation of U.S. Steel's safety procedures designed to protect employees from the highly toxic CO gas. *Id.*; *id.* at ¶ 25; [DE 23-5]. Ramsey and Lemp recommended to Rayfield Stringer, Staff Supervisor in Labor Relations, that Brock be terminated from his probationary period for this violation. *Id.* at ¶ 31. Stringer subsequently passed along this recommendation to Michael Simpson, the Department Manager in Labor Relations, who approved Brock's termination. *Id.* at ¶ 32.

During his shift on February 22, Brock was asked to report to Ramsey's office where he was notified of his termination for failing to test his CO monitor prior to the incident the previous day. [DE 23-7 at 20-21]. Brock admits that he failed to calibrate his CO monitor, that he entered an area with high levels of CO gas, and that he had no reason to disbelieve U.S. Steel's stated reason for his discharge. [DE 23-8 at 3-4]. Brock's USW representatives successfully convinced Keith Kolb, the Manager of Employee Relations, to give Brock another chance following his discharge. [DE 23-1 at ¶ 33; DE 23-7 at 23-24]. Kolb advised Brock that his probationary period would continue, and noted that Brock had to let his hair grow long enough that drug tests could be conducted properly. [DE 23-8 at 3].

**D. Brock's Second Termination**

On February 29, 2008, Simpson advised the Drug & Alcohol Testing Coordinator, Clare Granzow that Brock was starting his probationary period over and would be sent to the medical department for a breath and hair test. [DE 23-6 at ¶ 15]. Granzow was to record the length of Brock's hair if it was too short to be tested, so that the length of his hair could be monitored during his probationary period. *Id.* at ¶ 16. That day, Brock provided a breath and urine sample prior to returning to work, but a sample of hair could not be collected because there was none. *Id.* at ¶ 17. On two occasions following Brock's notice that his probationary period would continue, Brock was advised to maintain a minimum one and a half inches of hair for drug testing. [DE 23-8 at 7]. Brock returned to work on March 2, 2008.

Over the following months, Brock repeatedly failed to provide U.S. Steel hair from his head for drug testing. On April 17, 2008, Brock provided a breath test, urine sample, and underarm hair, but records reflect that there was no hair to measure on his head. [DE 23-6 at ¶ 18]. On May 8, 2008, Brock's hair was less than one centimeter long, and the medical notes reflected that his hair looked like it had been cut recently. *Id.* at ¶ 19. On July 1, 2008, Brock reported to the medical infirmary for a drug test, but his hair was too short to measure and record. *Id.* at ¶ 20.

On July 2, 2008, upon learning that Brock had repeatedly failed to grow hair to a length sufficient for drug testing, Sandy Armstrong (who had replaced Simpson as Manager of Labor Relations), Ramsey, and Stringer conferred and decided to discharge Brock for failing to comply with the conditions placed on his continued employment. [DE 23-1 at ¶ 37].

On July 4, 2008, Stringer notified Brock that he was fired for failing to comply with the instruction to let his hair grow for drug testing. [DE 23-1 at ¶ 38; DE 23-8 at 5, 7]. Brock admitted that Stringer advised him that his discharge was due to continued baldness or continued shaving. [DE 23-8 at 7, 10]. Brock's USW representatives did not challenge Brock's second

discharge. [DE 23-1 at ¶ 39].

**E. Brock's Lawsuit**

Brock, an African American, alleges in his complaint that U.S. Steel discharged him on two occasions based on his race in violation of Title VII. [DE 1]. Brock also brings state law claims for defamation and intentional infliction of emotional distress. *Id.*

### III. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence which "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party asserting that a fact is genuinely disputed must support any such assertion by "citing to particular parts of materials in the record" or showing "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). To establish a genuine issue of fact, the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial, not "simply show that there is some metaphysical doubt as to the material facts." *First Nat'l Bank of Cicero v. Lewco Secs. Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988)

7

(citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "It is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which he relies." *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). If the nonmoving party fails to establish the existence of an essential element on which it bears the burden of proof at trial, summary judgment is proper—even mandated. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (holding that a failure to prove one essential element "necessarily renders all other facts immaterial") (quoting *Celotex*, 477 U.S. at 322-23). If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the Court may: "consider the fact undisputed for purposes of the motion; [or] (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2-3).

In ruling on a motion for summary judgment, a court must view all facts in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255; *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *NUCOR Corp. v. Aceros Y Maquilas de Occidente*, 28 F.3d 572, 583 (7th Cir. 1994). A court must avoid the temptation to "make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Summary judgment is not a substitute for a trial on the merits or a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the court's sole task in ruling on a motion for summary judgment is "to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Payne*, 337 F.3d at 770; *Waldridge*, 24 F.3d at 920.

## IV. Discussion

Here, the Plaintiff, Brock, has failed to file any response or produce any facts or evidence to contradict U.S. Steel's assertions of fact or to substantiate his claims. Despite obtaining two extensions of time to do so, Brock's counsel submitted no response to U.S. Steel's motion for summary judgment. As a result, the following facts reflect the evidence submitted by U.S. Steel almost exclusively, and are presumed to be uncontested by Brock. *See* Fed. R. Civ. P. 56(e)(2); *see also* N.D. Ind. L.R. 56.1(b) (noting that a party opposing a motion for summary judgment must submit: (1) a response brief, containing a statement of genuine issues of material fact; and (2) evidentiary materials that the responding party contends give rise to the disputes). The Court, after considering the evidence as detailed below, finds that there is no genuine dispute as to any material fact.

### A. Title VII Claim

The record is devoid of evidence from which a reasonable jury could conclude that either of Brock's discharges were the product of racial discrimination under Title VII of the Civil Rights Act of 1964. As a result, summary judgment in favor of U.S. Steel is appropriate.

Title VII is violated if an employer "[fails] to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race[.]" 42 U.S.C. § 2000e-2(a)(1). In order to establish a violation of Title VII, an individual must show discrimination under either the "direct" or "indirect" methods of proof. *Atanus v. Perry*, 520 F.3d 662, 671 (7th Cir. 2008).

### *1. Direct Method*

Under the direct method of proof, a plaintiff shows discrimination by pointing to either an admission by the decisionmaker that his actions were based on a prohibited criterion or a

convincing mosaic of circumstantial evidence that points directly to a discriminatory reason for the employer's action. *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 631 (7th Cir. 2009); *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 783 (7th Cir. 2004). "Direct evidence is evidence that, if believed by the trier of fact, would prove discriminatory conduct on the part of the employer without reliance on inference or presumption." *Rhodes v. Ill. Dept. Of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004). Because outright admissions of discriminatory intent are rare, circumstantial evidence is more typically proffered to show discriminatory intent under the direct method of proof. *Darchak*, 580 F.3d at 631 (noting examples of circumstantial evidence, including: suspicious timing, ambiguous oral or written statements, statistical evidence of disparate treatment, and passing over otherwise qualified candidates in hiring). *See also Lewis v. Sch. Dist. No. 70*, 523 F.3d 730, 742 (7th Cir. 2008) ("Circumstantial evidence allows the trier of fact to infer intentional discrimination by the decisionmaker.")

Brock does not offer direct evidence of discrimination, and the undisputed facts do not support a finding of racial discrimination under the direct method of proof. There is no evidence that any U.S. Steel manager or employee admitted that Brock's discharge was based on racial discrimination. There is also no circumstantial evidence of discrimination before the court. Brock has presented no facts to suggest that U.S. Steel treated employees in the protected group differently, or that employees outside the protected group received better treatment. *See Darchak*, 580 F.3d at 631 (finding such evidence relevant). In fact, evidence before the court reflects that another employee outside Brock's protected class was terminated for failing to grow hair sufficient for drug testing. [DE 23-10 at 3]. Having cited no direct or circumstantial evidence of racial discrimination, Brock has not proved a violation of Title VII under the direct method.

*2. Indirect Method*

When the direct method of proof is unavailable, a plaintiff may turn to the indirect method of proof set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under the indirect method of proof, the plaintiff may establish a *prima facie* case of discrimination by showing that: (1) he belongs to a protected class; (2) he performed his job to the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class were treated more favorably by the employer. *Atanus*, 520 F.3d at 672-73. Summary judgment for the defendant is appropriate if the plaintiff fails to establish each element of the prima facie case. *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 939 (7th Cir. 2007).

If a plaintiff makes out a prima facie case, the burden shifts to the defendant to state a legitimate, non-discriminatory reason for its actions. *McDonnell Douglas*, 411 U.S. at 802-03. "Although the burden of production here shifts to the defendant, 'the burden of persuasion rests at all times on the plaintiff.'" *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 508 (7th Cir. 2004) (quoting *Haywood v. Lucent Techs.*, 323 F.3d 524, 531 (7th Cir. 2003)). If a legitimate, non-discriminatory reason is offered, the burden shifts back to the plaintiff to prove that the articulated non-discriminatory reason is a pretext for discrimination. *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 538 (7th Cir. 2007). "A pretext . . . is a deliberate false-hood." *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 726 (7th Cir. 2008) (citing *Kodl v. Bd. of Educ. Sch. Dist. 45*, 490 F.3d 558, 562 (7th Cir. 2007)). To show pretext, the plaintiff must show more than that the defendant's decision was mistaken, ill considered or foolish, and as long as the employer honestly believes the reasons it gives, pretext has not been shown. *Id.* (citing *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006)). The Court does "not sit as a 'super-personnel department,' weighing the wisdom of a company's employment decisions; rather, [it

11

is] concerned only with whether the employer's proffered explanation was honest." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001).

Because Brock has not offered any evidence of direct racial discrimination, his case must proceed under the indirect method. Brock therefore must make out a *prima facie* case of racial discrimination. Undisputed facts show that Brock has satisfied requirements (1) and (3) of a *prima facie* case of racial discrimination—he is African-American and therefore belongs to a protected class, and he suffered an adverse employment action when he was terminated. However, U.S. Steel contends that Brock failed to satisfy requirement (2): that Brock performed his job to U.S. Steel's legitimate expectations, or requirement (4): that similarly situated U.S. Steel employees outside the protected class were treated more favorably, with regard to either instance of his termination. [DE 24 at 14-18].

The Court finds U.S. Steel's arguments merited because Brock has not cited any facts to suggest that he performed his job to U.S. Steel's legitimate expectations. In fact, the uncontroverted facts reflect that Brock did not do so. *See O'Neal v. City of Chicago*, 588 F.3d 406, 410 (7th Cir. 2009) (police officer did not meet department's legitimate expectations because her conduct "jeopardized the safety of [an] undercover officer"); *Contreras v. Suncast Corp.*, 237 F.3d 756, 760-61 (7th Cir. 2001) (employee was not meeting legitimate expectations because he " was repeatedly cited for operating his forklift in an unsafe manner").

Brock's first termination was due to his failure to test his CO monitor before entering a high-risk area. Brock was aware of company policy that required CO monitor testing to ensure employee safety, but admits that he did not follow that policy. His failure to do so jeopardized his own well being as well as that of his fellow workers.

With regard to the second termination, Brock was again discharged for failing to comply with company policy designed to ensure employee safety. Company policy required drug testing

of all employees on probation in order to reduce the risk of workplace injuries resulting from employee impairment. Brock does not dispute that he was repeatedly directed, on no fewer than four occasions, to allow his head hair to grow to one and a half inches in length to permit drug testing. But on numerous occasions during his probationary periods, U.S. Steel was unable to collect head hair samples to test for drug use because Brock had not complied with his employer's instructions. By failing to comply with U.S. Steel's safety-related policies, Brock failed to perform his job to his employer's legitimate expectations.

Additionally, Brock has not provided evidence to suggest that similarly situated U.S. Steel employees outside the protected class were treated more favorably than he was. Brock admitted that he could not identify any white employee who was not disciplined after failing to calibrate his or her CO monitor. [DE 23-8 at 10]. He also admitted that he had no evidence of U.S. Steel refraining from disciplining any employee who failed to maintain head or body hair for testing. *Id.* On the contrary, evidence before the Court shows that similarly situated employees who failed to maintain sufficient hair for testing were disciplined. U.S. Steel did terminate a white employee for failing to maintain hair sufficient for drug testing during his probationary period.[1] [DE 23-10 at 3]. Brock has thus failed to establish that similarly situated employees outside the protected class were treated more favorably. Because Brock has failed to establish two of his claim's essential elements, summary judgment is appropriate.

But even if Brock had established a *prima facie* case of discrimination, he has not shown that U.S. Steel's stated reasons for his discharge are a pretext for discrimination. As reasons for his discharge, U.S. Steel cited Brock's failure to calibrate his CO monitor and his failure to follow instructions to keep his hair longer than one and a half inches in order to permit drug testing. [DE 23-1 at ¶¶ 30, 31, 38; DE 23-8 at 5, 7]. There is no evidence before the Court to

---

[1] Two other African-American employees were also terminated for this reason. [DE 23-10 at 3].

suggest that U.S. Steel did not "honestly believe" these reasons when it fired Brock. *Petts*, 54 F.3d at 726. Brock himself admitted that he failed to calibrate his CO monitor, and testified in his deposition that he believed that this failure was the only reason for his initial discharge. [DE 23-8 at 3-4]. Brock may well believe that his second termination was the result of discrimination. *See* [DE 23-8 at 6] ("I believe that [the firing] was racially motivated."). But he cites no evidence to support that conclusion. *See Mills v. First Fed. Sav. & Loan Assoc. of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996) (holding that with regard to legal conclusions, "subjective beliefs of the plaintiff are insufficient to create a genuine issue of material fact"). Moreover, the fact that a white employee was terminated for the same reason that Brock was undermines this theory. [DE 23-10 at 3]. Because Brock offers no evidence that U.S. Steel's legitimate, non-discriminatory reasons for his termination were pretext, summary judgment in favor of U.S. Steel would be appropriate even if Brock had made out a prima facie case of discrimination.

If evidence supporting the direct method of proof does not exist, and a plaintiff cannot make out a prima facie case under the indirect method of proof, a claim for racial discrimination should be dismissed without further analysis. *See Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993) ("Without a *prima facie* case, the plaintiff cannot withstand summary judgment."). The Court therefore finds summary judgment in favor of U.S. Steel appropriate on Brock's Title VII claim.[2]

---

[2] Additionally, the Court notes that Brock has not cited any evidence to show that U.S. Steel's stated reason for Brock's termination was pretextual. When an employer articulates a legitimate reason for a plaintiff's termination, the plaintiff then bears the burden of showing that the stated reason is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. Pretext is "more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838-39 (7th Cir. 2009). If the employer reasonably believed the explanation it offered, the reason is not pretextual. *Silverman v. Bd. of Educ.*, 637 F.3d 729, 744 (7th Cir. 2011). "[A] plaintiff must do more than simply allege that an employer's stated reasons are inaccurate; he must still have some circumstances to support an inference that there was an improper motivation proscribed by law."

**B. State Law Claims**

Having dismissed the claims over which this Court had original jurisdiction, the Court has the discretion to remand the remaining state claims under 28 U.S.C. § 1367(c)(3). *See Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 619 (1988); *Bean v. Wis. Bell, Inc.*, 366 F.3d 451, 456 (7th Cir. 2004). A district court exercises significant discretion in determining whether to retain such pendent claims, based upon "the principles of considerations of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." *Cohill*, 484 U.S. at 357. Given these principles, "when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). However, courts have recognized three exceptions to this general rule: when (1) "the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court"; (2) "substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort"; or (3) "when it is absolutely clear how the pendent claims can be decided." *Id.*

The Court finds the latter two grounds for an exception applicable in this case. U.S. Steel has briefed Brock's state law claims, and this Court is intimately familiar with the details of the case. Requiring the state court to take up these claims would cause a substantial duplication of effort. Additionally, the supplemental claims are straightforward and easily decided based on established state precedent. For these reasons, the Court elects to exercise supplemental jurisdiction over Brock's state law claims.

***1. Defamation Claim***

---

*McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009). Here, however, Brock has presented absolutely no evidence to show that U.S. Steel did not honestly believe the reason it gave for firing him. As a result, even if Brock had established a prima facie case of discrimination, the Court would find summary judgment for U.S. Steel warranted.

Brock brings a state law claim for defamation *per se*.[3] Brock's defamation claim relies on information Brock alleges that he heard from a co-worker named "Butch". In his deposition, Brock testified that Butch told him that management had told other employees, including Butch, that Brock was being fired for failing a drug test. [DE 23-8 at 10-11]. Brock does not know who supposedly told Butch this information, but guesses that it was David Hardy. *Id.* at 11.

Even assuming that Butch's statement, as relayed by Brock, could be considered admissible evidence,[4] Brock's defamation claim fails as a matter of law. Brock has offered no evidence to support holding U.S. Steel liable for the alleged defamation, even if it did occur. In order for an employer to be held liable for an intentional tort by its employee, the plaintiff must show either that (1) the corporation is the tortfeasor's alter ago, or (2) that the corporation substituted its will for that of the individual who committed the tortious act. *Holbrook v. Lobdell-Emery Mfg. Co.*, 219 F.3d 598, 601 (7th Cir. 2000); *Perry v. Stitzer Buick GMC, Inc.*, 637 N.E.2d 1282, 1287 (Ind. 1994). In order to find the corporation liable under the "alter ego" theory, the plaintiff must show that both ownership and control of the corporation were in the tortfeasor's hands. *Holbrook*, 219 F.3d at 601. In order to find the corporation liable under the substituted will theory, the plaintiff must show that the individual who committed the tort was

---

[3] "A defamatory communication is said to either be 'defamatory *per se*' or 'defamatory *per quod*.' A communication is defamatory *per se* if it imputes: (1) criminal conduct; (2) a loathsome disease; (3) misconduct in a person's trade, profession, office, or occupation; or (4) sexual misconduct. All other defamatory communications are defamatory per quod. . . . Actions for *per se* and *per quod* defamation are susceptible to different requirements with regard to the showing of damages." *Kelley v. Tanoos*, 865 N.E.2d 593, 596-97 (Ind. 2007) (citations omitted).

[4] The Court recognizes U.S. Steel's argument that Butch's alleged statement to Brock, which Brock offers to show that management made a defamatory communication to Butch, is hearsay. *See* [DE 24 at 19-20]. But the Court also notes that this statement might still be admissible as an admission of a party-opponent under Federal Rule of Evidence 801(d)(2)(D). However, the lack of information about the circumstances under which Butch's statement was made–including about who Butch is, what his job was, and what duties he performed–prevents the Court from determining whether this exception should apply. *See Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 761 (7th Cir. 2003) (reciting Rule 801(d)(2)'s requirements). Even assuming that Butch's statement is admissible, though, Brock's claim must fail, as discussed *infra*.

acting pursuant to a policy or decision made through the corporation's regular decision-making channels by those with authority to do so. *Id.* Further, the plaintiff must show that his injury was the intended product of this policy or decision. *Id.* If the corporation is not the tortfeasor's alter ego and the corporation has not substituted its will for that of the tortfeasor, then liability of the tortfeasor cannot be imputed to the corporation.

The undisputed facts do not support the conclusion that U.S. Steel could be held liable for the alleged defamatory communication. Under the alter ego theory, Brock has failed to show that the individual who allegedly took part in the defamatory communication had ownership or control of the corporation. In fact, Brock cannot identify the individual who made the communication with any degree of certainty, instead guessing that it was David Hardy. [DE 23-8 at 11]. *See also Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999) (holding that statements that are not based on personal knowledge or that are the result of speculation or conjecture are insufficient to establish a genuine issue of material fact). Furthermore, Brock has failed to set forth any facts to suggest that the corporation substituted its will for that of the individual tortfeasor, or that the tortfeasor acted within the scope of his or her authority pursuant to a policy or decision of the corporation. *See Bochenek v. Walgreen Co.*, 18 F. Supp. 2d 965, 974 (N.D. Ind. 1998) ("Without knowing which Walgreens' employees made the comments heard by her daughter and neighbor, it is not possible to determine whether the employees made the comments within the scope of their employment."). Any liability for a defamatory comment therefore cannot be imputed to U.S. Steel. Summary judgment on Brock's defamation claim is thus warranted.

## 2. Intentional Infliction of Emotional Distress Claim

Under Indiana law, a plaintiff claiming intentional infliction of emotional distress must establish that the defendant intentionally or recklessly caused severe emotional distress by

"extreme and outrageous conduct". *Powdertech v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002); *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991). Conduct qualifies as extreme and outrageous

> only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Conwell v. Beatty*, 667 N.E.2d 768, 777 (Ind. Ct. App. 1996) (citing Restatement (Second) of Torts § 46 cmt. d (1965)). A company firing an employee pursuant to its disciplinary policies has been held not to constitute extreme and outrageous conduct. *Powdertech*, 776 N.E.2d at 1264. *See also Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 650 (7th Cir. 2006) (holding that terminating a professor for engaging in inappropriate conduct with students did not constitute extreme and outrageous conduct under Indiana law) (applying *Powdertech*); *White v. Kroger Ltd. P'ship II*, No. 1:08-CV-1735, 2010 WL 5099304, at *8 (S.D. Ind. Dec. 8, 2010) (holding that firing a baker pursuant to a supermarket's progressive disciplinary policy did not constitute extreme and outrageous conduct under Indiana law); *Ellis v. CCA of Tenn., LLC*, No. 1:08-CV-254, 2010 WL 2605870, at *8 (S.D. Ind. June 21, 2010) (holding that even unwarranted disciplinary actions do not constitute extreme and outrageous conduct under Indiana law).

Brock's claim of intentional infliction of emotional distress fails as a matter of law because U.S. Steel's conduct—terminating Brock pursuant to its disciplinary policy—clearly does not rise to the level of extreme and outrageous conduct. As discussed previously, there is no genuine issue as to whether U.S. Steel discharged Brock based on his race or any other prohibited criterion. Rather, the facts establish that U.S. Steel's discharge of Brock was based on legitimate company policy and procedures. Summary judgment on Brock's claim of

intentional infliction of emotional distress is appropriate.

## V. Conclusion

Based on the foregoing, Defendant's Motion for Summary Judgment [DE 22] is hereby GRANTED. The Court DIRECTS the Clerk to enter judgment in favor of Defendant and against Plaintiff on all claims, and to treat this case as closed.

SO ORDERED.

ENTERED:   August 8, 2011

                                                /s/ JON E. DEGUILIO
                                       Judge
                                       United States District Court